IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 14-110-CG-M |
| NALL'S NEWTON TIRE a/k/a NALL'S NEWTON TIRE SERVICE, INC., | ) ) ) ) | |
| Defendant. | ) ) | |

**ORDER**

This matter is before the court on the motion of Nall's Newton Tire ("NNT")

to exclude the expert testimony of Bryan Cash and Jeb Harrison (Doc. 81), NNT's

supplement to its motion to exclude (Doc. 82), opposition thereto filed by

Nationwide Mutual Insurance Company ("Nationwide") (Doc. 83) and NNT's reply

(Doc. 86).  For the reasons stated below, the court finds that NNT's motion should

be denied.

**BACKGROUND**

This case arises from insurance claims made for damage resulting from a fire

that occurred at NNT's premises on December 18, 2012.  Nationwide asserts in its

complaint that no coverage exists for NNT's claims under their policy of insurance.

(Doc. 1).  Specifically, Nationwide asserts that the fire was the result of arson, that

NNT had a motive for burning the building and that the evidence implicates NNT

in the setting of the fire. (Doc. 52).  As such, Nationwide contends fire coverage is excluded by the policy of insurance and that NNT's submission of the claim for the fire loss amounts to a misrepresentation that voids the policy. (Doc. 52).  On April 3, 2014, NNT filed its answer to the complaint and asserted counterclaims for breach of contract and bad faith refusal to pay. (Doc. 9).  NNT denies that the fire is the result of arson and contends that there is evidence to show that Nationwide intentionally or recklessly failed to properly investigate NNT's claim or intentionally or recklessly failed to properly subject the claim to a cognitive evaluation or review. (Doc. 63, pp. 10-16).

## LAW

The United States Supreme Court, in Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993), found that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable.  "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability."  Dhillon v. Crown Controls Corporation, 269 F.3d 865, 869 (7th Cir. 2001); see also U.S. v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999).   However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). "[A] district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." Id. (citing Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001)).  "Quite the contrary, '[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " Id. (quoting Daubert, 509 U.S. at 596, 113 S.Ct. at 2798).

> Rule 702 of the Federal Rules of Evidence provides:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The rule compels district courts to "conduct an exacting analysis of the foundations of the expert opinions to ensure they meet the standards for admissibility under Rule 702." United States v. Abreu, 406 F.3d 1304, 1306 (11th Cir.2005) (quoting United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004) (internal quotation marks omitted)).  Accordingly, under Rule 702, "this Court has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." Whatley v. Merit Distribution Services, 166 F.Supp.2d 1350, 1353 (S.D. Ala. 2001) (citations omitted).

The Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether: "(1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1999)). These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs. See id. "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)); see also Whatley, 166 F.Supp.2d at1354 ("the proponent of the expert testimony has the burden to establish by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.")(citations omitted). Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular ... technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant ... community.

Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1194 (11th Cir. 2010) (internal quotation marks and alterations omitted). Additional factors that may be taken into account by a district court include:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of

4

the litigation, or whether he has developed his opinion expressly for purposes of testifying;

    (2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

    (3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

    (4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's note to 2000 amendments (internal citations omitted).

## DISCUSSION

### 1. Bryan Cash

NNT contends that Nationwide's expert, Bryan Cash, relied in part upon "fraudulent and misinformation" (sic) in reaching his conclusion that the fire was intentionally set. Specifically, NNT points to the fact that Cash relied on a video from the bank across the street from the fire that reportedly showed that the fire first extended out of the upstairs bedroom window. That information supported a finding that there were two separate areas of origin of the fire, thus indicating that the fire was not accidental. However, that information was incorrect. (Doc. 81-1, p. 2). The apartment window reportedly cannot even be seen from the camera angle of the video. (Doc. 81, ¶ 5). Cash testified at his deposition that he relied on this information in part to form his conclusion. (Doc. 81-1, p. 2). Cash's report stated that "[a] video, along with burn pattern analysis and witness statements, confirm these [two] areas [of origin]. (Doc. 83-1, p. 3).

The witness statements Cash refers to are statements from Chief Tate, Paul Foster and the State Fire Marshal, Jeb Harrison. (Doc. 83-1, p. 4). Cash testified that Tate and Harrison said Mr. Nall told them he saw the fire upstairs on the bed. (Doc. 83-1, p. 4). Harrison also reportedly told Cash that James Jones, the first responding officer, told Harrison that he saw the fire upstairs. (Doc. 83-1, p. 4). Cash reports that, even if Mr. Nall had not said that he thought the fire started upstairs, his opinions would not change because the burn patterns are consistent with there being a fire in that apartment that was not communicated from the fire downstairs. (Doc. 83-1, pp. 9-10).

The first responding officer to the fire, James Jones, states that the upstairs bedroom was not on fire when he arrived and walked around the building. (Doc. 81-1, pp. 3-4). Jones agrees that Mr. Nall told him that the fire started upstairs, but says the fire had not made it to the North end of the building. Cash admits that he did not take Jones's account into consideration because Jones did not execute his affidavit until after Cash wrote his report. (Doc. 81-1, p. 11). Cash did not interview Jones when he conducted his investigation because Jones "wasn't available at the time" and it was his impression that he would get copies of Jones's written statement. (Doc. 83-1, p. 12). Cash stated, however, that knowing Jones's account still does not change his conclusion that the fire was incendiary. (Doc. 81-1, p. 11). Cash testified that he based the second point of origin on the burn patterns. (Doc. 83-1, p. 11). He explained his conclusion in spite of the contrary account as follows:

> All that other data, witness statements, videos, early pictures of the fire coming out of the window that's in my notes that you've seen, all of that is data that helps confirm the burn patterns. The burn patterns

are the science.  It's the science of what we deal with, and there's no
doubts that we have two points of origin.

(Doc. 83-1, p. 11).  Cash testified that the burn patterns show that there was a fire

on the bed. (Doc. 83-1, p. 8).  Jones further testified as follows:

> … the burn patterns that we're seeing from the downstairs fire moves
> up and out.  However, it did not travel into the office area, which is
> why that area is not damaged by fire.  And it's also – it did not get into
> the office and burn up and through the floor into the apartment.  And
> the burn patterns that we're seeing from the apartment, specifically
> the bed, when it burns, it burns through the floor.  And as in the
> pictures, I showed the floor joists are burned from the top down.
> However, it burned enough to where it can completely came through
> and into the office and set the office on fire.  So, there's no fire in the
> office whether it's from the second floor or from the first floor.

(Doc. 83-1, pp. 14-15).

NNT points out that the standard guidelines for investigators state that the

investigator should seek information "from persons having knowledge (such as

occupants) about recent activities in the area of the origin and what fuel items

should or should not have been present, such as the occupants. NFPA 921 §

19.3.1.6.  Cash reportedly did not interview the occupant of the apartment.  NNT

also points out that Cash's diagram of the of the fire scene did not indicate the

compass orientation which the standards state should be provided on any diagram

created by an investigator.  NFPA 921 § 16.4.4(B).

The evidence shows that Cash could have been more thorough in his

investigation and that some of the evidence he relied upon to corroborate his

conclusion was not reliable.  However, none of the evidence shows that Cash's burn

analysis was unreliable.  Cash's testimony indicates that the burn patterns

demonstrate that there are two areas of origin even without corroboratory evidence.

7

The fact that Cash did not comply with every NFPA standard does not show that his methodology is unreliable.  For instance whether he properly included a compass orientation on his diagram does not indicate that the diagram or conclusions based on the diagram are inaccurate.  Cash maintains that even with the contrary evidence, his conclusion is still sound.   The Court is cognizant that "a district court must not simply tak[e] the expert's word for it." Edwards v. Shanley, 2014 WL 4747186, *6 (11th Cir. Sept. 25, 2014) (citation and internal quotations omitted).  "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." Id. (quoting United States v. Frazier, 387 F.3d 1244, 1258, 1261 (11th Cir. 2004) (en banc)).  The Court finds this to be a close case, but Cash has explained that his conclusion is firmly based on his burn pattern analysis and there has been no suggestion that his burn pattern analysis itself is faulty or unreliable.  As previously explained, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Technology DC–8, Inc., 326 F.3d at 1341.   "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert, 509 U.S. at 596, 113 S.Ct. at 2798).

**2. Jeb Harrison**

NNT contends that the opinions of Fire Marshal Jeb Harrison should be excluded because he did not follow all of the NFPA standards and because NNT has

not had the opportunity to fully explore Harrison's investigation, findings and

conclusions.[1]  NNT reports that Harrison either ignored or did not consider the

account of the first responder to the fire, Officer James Jones.   As the court

discussed with regard to Cash, the fact that Harrison did not comply with every

NFPA standard or interview every witness does not by itself show that his

methodology is unreliable.

More concerning is NNT's complaint that although Harrison gave deposition

testimony, he did not answer some questions posed by NNT's counsel because of an

ongoing criminal investigation.   Harrison did not answer certain questions on the

basis of Alabama Code § 12-21-3.1, which provides, in pertinent part, the following:

> (a) Neither law enforcement investigative reports nor the testimony of
> a law enforcement officer may be subject to a civil or administrative
> subpoena except as provided in subsection (c).
>
> * * * *
>
> (c) Under no circumstance may a party to a civil or administrative
> proceeding discover material which is not authorized discoverable by a
> defendant in a criminal matter. Noncriminal parties may upon proper
> motion and order from a court of record: Secure photographs,
> documents and tangible evidence for examination and copying only by
> order of a court imposing such conditions and qualifications as may be
> necessary to protect a chain of custody of evidence; or protect the
> prosecutors', law enforcement officers', or investigators' work product;
> or to prevent the loss or destruction of documents, objects, or evidence.
> Such discovery order may be issued by a court of record upon proof by

---

[1] The court notes that Nationwide objects to NNT's supplemental motion to exclude as untimely.
The supplemental motion contains some of NNT's arguments with regard to their motion to
exclude Harrison's testimony.  Although the supplement was filed two days after the 16(b)
Scheduling Order deadline for Daubert motions, the original motion was timely and Nationwide
was already put on notice that it must demonstrate that Jeb Harrison's testimony is reliable.
Once the issue of reliability of Harrison's testimony was raised, this Court had an obligation to
screen the expert testimony to ensure it stems from a reliable methodology, sufficient factual
basis, and reliable application of the methodology to the facts.  Thus, the Court will consider
NNT's additional arguments.

substantial evidence, that the moving party will suffer undue hardship
and that the records, photographs or witnesses are unavailable from
other reasonable sources.

ALA. CODE § 12-21-3.1.

However, after a thorough review of Harrison deposition testimony, the Court

finds that Harrison sufficiently explained his analysis and methodology.  He

testified that he met with John Nall, Chief Tate, Officer Paul Foster and Fire

Captain Bailey and several other firefighters. (Doc. 83-2, pp. 4, 36, 37). He

explained his general investigatory procedure he uses when he arrives at the scene

of a fire – what he does and what he looks for. (Doc. 83-2, pp. 4-5, 10). He stated

that he actually did those things for this fire. (Doc. 83-2, p. 5).  Harrison also

provided copies of the photos he took at the scene. (Doc. 83-2, pp. 6-7).  He testified

concerning the time he arrived at the scene, (Doc. 83-2, p. 8) and he provided

detailed explanations about what happened and what he did and saw while he was

at the scene and how he conducted his investigation. (Doc. 83-2, pp. 9-67).  Harrison

also testified regarding what his conclusions were and what he generally based

them on. (Doc. 83-2, p. 53).  Harrison did not provide his investigatory reports, notes

or written analysis (Doc. 83-2, p. 53), but testified that it was his understanding

that they could request that information from the district attorney's office. (Doc. 83-

2, p. 54). The only question NNT points to that Harrison did not answer at his

deposition is whether Harrison talked to Art Ramos – who apparently did not

witness the fire, but is an employee of NNT.  Nationwide's counsel reports that the

district attorney has made his file, which included Harrison's investigation,

available to NNT's counsel. (Doc. 83, p. 6).  In light of Harrison's deposition

10

testimony and the fact that Harrison's file has been provided to NNT, the court finds no reason to exclude his testimony.  Harrison appears to have based his conclusions on a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts.

## CONCLUSION

For the reasons stated above, the motion of Nall's Newton Tire to exclude the expert testimony of Bryan Cash and Jeb Harrison (Docs. 81 & 82), is hereby **DENIED**.

**DONE** and **ORDERED** this 12th day of August, 2015.


/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE